You may proceed. Thank you very much, Your Honor. May it please the Court, Counsel, my name is Spencer Kelley. For the appellant, Mark Coonrod. I'd like to reserve five minutes, if that's okay for rebuttal. We're here to ask that the District Court's granting of summary judgment be reversed. This case stems from an issue, an incident that took place when a hoist manufactured by defendant CMCO and serviced by Concranes fell and landed on the head of Mr. Coonrod. During the investigation into what happened, it was found that there was a screw or a bolt that was about half an inch too long that was in the hoist that had come unscrewed or became loosened and caused the hoist to fall. The claim was brought against both CMCO as a strict liability, products liability case, and against Concranes for failure to inspect and properly service the hoist. Summary judgment was granted by the District Court because the District Court indicated that Coonrod could not meet its prima facie case for a strict liability and that it failed as a matter of law. In doing so, the District Court primarily focused on the seaboard case, indicating that the seaboard case was on point because in the seaboard case there was a fuse that was installed in a car and that fuse was beyond the wattage what should have been in the car and therefore there was a fire that took place and caused damages. Appellant Coonrod believes that the seaboard case is distinguishable for a number of reasons. The main reason is because the warning in the seaboard case for the defendant in that case was said that you should not use a fuse that was beyond the wattage. Here there was not an adequate warning. The only warning that was presented that was in the initial hoist manual was used manufactured parts. So there was no specific warning about whether or not a screw that was longer than the .75 inches. We only get to the warning issue though if it was foreseeable that someone would use a non-conforming screw, right? That's correct and that's where we rely upon our expert. Our expert in the case indicated that because for CMCO to specifically warn individuals and that was foreseeable for someone to service that hoist that it's foreseeable that they could use a nut or bolt that was too long that could cause this problem. So your evidence of foreseeability is that your expert testified that these are interchangeable? That's correct, Your Honor. Did you have any other evidence of foreseeability? Well, we rely primarily on our experts foreseeability as far as regarding the specific size of the bolt. Well, he didn't say the size was really the problem. He said it was the lack of Loctite. That was one of the issues, yes. One of the issues was the failure to use the Loctite on the bolt and then also the failure to warn the users of the product. I understand that but I'm trying to understand his foreseeability argument or his theory that when a bolt of standard size is needing replacement, I think what he's saying is that someone on the ground who's using this machine or someone who's repairing the machine may not necessarily go to the instructions in the manual and would just pick up a bolt that's available and screw it in? Is that what he's saying? Well, I think that brings up a good question. I think there's two parts to that question, right? The first part is whether or not it was foreseeable for them to use an interchangeable bolt and whether or not there was a warning in the actual manual that said this is the size bolt that you need to use. And so what I think our expert is saying essentially in the case is that it is foreseeable for an individual that's servicing the hoist unit to look into the manual and see what size bolt or screw should be used to install in the specific hoist and that warning was not there. And so that's where there was a case that was in our reply brief, the Stewart matter, that's directly on point. In the Stewart case, what happened was there was bolts that were installed in reverse order because there was no adequate warning and as a result there was an injury that took place. And in that case, the appellant was able to survive a motion for dismissal in that case, not a summary judgment, but basically the same standard because there was a failure to adequately warn regarding how the bolts were to be installed. And in this case, there was no warning. So I thought everyone agreed though that if Loctite had been used, the fall wouldn't have happened. Yes, that's correct. And so why was it foreseeable that the Loctite wouldn't be used? Where's the evidence that that is? Well, and again, we go back to that same failure to warn, Your Honor. Yeah, but you already agreed we don't get the failure to warn unless it's foreseeable. And I couldn't find where it was foreseeable, where anyone testified that it was foreseeable that someone would not realize they needed to use Loctite.  Where did the experts say that people foreseeably wouldn't use Loctite? No, what I think our expert was saying was that it was important in the warning to indicate that Loctite was required. Right, but we only get to that if it's foreseeable that someone might not use Loctite. Right, but that's where we're trying to argue that if the bolt were to be replaced, that that's when the warning would come into place. But doesn't the case law say we only talk about whether the warning is adequate if there's a foreseeable replacement that's going to happen? And so here, what I'm asking is, how do we even get to the warning if we don't have any evidence on your side saying it was foreseeable that someone would put in a screw without Loctite? Okay, yeah. So where we get to that is where we get into the design defects that were pointed out by our expert. So specifically, that there was only one screw that was installed for this hoist. And so it was foreseeable that when there was only one screw that was installed, that that one screw could fail. And that one screw would need to have the adequate warning to explain what size screw would be used and the Loctite. But so that idea that it should have been designed totally differently with three screws or whatever, I have trouble with that argument because it just doesn't seem like this device has been falling in other instances. Like, there's not a safety record of this thing being a problem. So it's hard for you to win that argument. Yeah. And that's where it gets a little tricky for us, Your Honor. And I will concede that point, of course. You know, what happened in this case is the hoist left CMCO's possession. It was then serviced by Concrane's about a year before this incident. And we have evidence that the user of the hoist did not touch or even inspect the hoist until the incident happened. And so, therefore, something happened when Concrane's, if it is true, if it's true that CMCO sent this out with the correct size bolt and with the Loctite, as it indicates in its arguments, then when Concrane's came in and serviced the item, the hoist, something happened that that bolt was changed. And that is specifically a question, the fact that we believe should have been able to survive summary judgment. Mr. Court thought that was too speculative, right? Because, I mean, at least the records from Concrane's don't say they touched this part. So it would have, we'd have to assume that they did it instead of someone at the facility later. Right. But we have evidence that no one in the facility, no one at the facility, none of the users of the hoist. In fact, they kind of admitted that they did not inspect the item. And so we have evidence that that happened. So the only, the last time someone touched the actual hoist was Concrane's. And essentially what we're asking is, is that there's a reasonable inference that Concrane's may not have, you know, properly notified or put down the correct, what they actually modified when they serviced the hoist. And again, that's a question of material fact that we believe should be presented to a jury. Well, let me ask you, was there any evidence that any person or entity ever serviced or inspected the hoist other than Concrane's? Concrane's. The only other entity that serviced the hoist was Ace, which installed the original hoist that was received from CMCO. CMCO sent the hoist to Ace. Ace installed it using CMCO's installation packet. And then Concrane was the only other, only other party that touched the hoist before the fall. There's evidence that the user of the fall, or the user of the hoist after the incident, serviced the hoist. But that's not relevant for, in regards to what happened. And did you have a theory as to who installed the wrong screw? Yeah. Well, so that, our theory is, all evidence points to the fact that Concrane's was the last party to touch the hoist. Right? So we believe that there's a reasonable inference that could be the hoist. No one from the user testified that they even touched it or serviced it. So therefore... So from the user, was there testimony of the nature, every time someone touched it, we made a record of it? What there was, was there was supposed to have been an every 30-day evaluation to look at the hoist to make sure it was still serviceable. And the user did not do that. Right. I So if we had touched it, there would be a record or we just have a silence? Because the fact that there isn't the monthly inspection doesn't tell us that at some point it wasn't creaking and someone changed the screw and they just didn't write it down. And so we don't have discovery about that. Yeah. We do not know whether or not there was no, there's no indication that anyone from the user actually touched the hoist product. But I guess your answer is no, there's no policy at the user that every So that leaves us with speculation about whether it was the user or Concranes, right? Well, speculation or reason, we would categorize that as a reasonable inference. Right. And that's a specific question of material fact that should allow us to summarize judgment or survive summary judgment. Whether or not a reasonable jury could find that Concranes didn't actually touch it or Concranes did touch it, that's the question for material fact that should have allowed us to survive summary judgment. I'll reserve the rest of my time for rebuttal. Very well. Thank you. Thank you. Good morning, Your Honors. May it please the court, counsel, just to set up before we go. And the intention is that I will discuss many of the design defect issues as well as the negligence claim against my client, Columbus McKinnon. Counsel for Concranes will address the negligence claim against his client and any remaining questions the court might have about the design defect theories. Go ahead and state your name for the record. Oh, I'm sorry. Erin Kinnear from Phillips Lytle for Columbus McKinnon. Before going, I've got a question for you before we get started. Go right ahead. The operator's manual directs that only factory authorized screws be used to replace the one screw holding the upper hook suspension in place and that the screw be inspected every 30 days to ensure that it's tightly in place. Unless the owner reviews the operator's manual, how would they know to do that? Well, Your Honor, this is something that is not only in the operator's manual, but this is something that you would find in the industry standards. I believe ASME B30.20 is the one that's on the machine. When a person's looking at that screw, that there's something special about that screw they need to be familiar with. No, Your Honor. There are instructions on the machine to consult the manual, but not specifically to that particular question. Your client sold more than 63,000 Mangard hoists since 2004. Is that right? Yes, that's right, Judge. What do you believe are the odds that every one of those 63,000 hoists owners and God knows how many operators strictly follows the operator's manual? Well, Your Honor, it's not a guarantee that everyone does that. That's certainly something that we would have to agree with you on, but the manual is there for a reason. My question is, what are the odds? Is it 100% that everyone's going to do that? I certainly couldn't say that. You'd have to say it's less than 100%, right? I would. Okay. What are the odds that when this one screw needs replacement, that every owner and operator will go to the operator's manual to see how to replace the screw? This is standard screw, too, by the way. Well, Your Honor, these are industrial equipment. What are the odds of that happening? I don't have an answer on that. Less than 100%? It would be less than 100%, but again, this is, these are industrial equipment. These are not your everyday, I'm not going and using one. These are qualified users. They're supposed to be using these pieces of equipment. They're supposed to be the ones making the repairs on them. And just on what we seem to be focused on here, I want to make clear up front, plaintiff in this case has not pled a strict liability claim under a failure to warn theory. I see that this is something we're focusing on a lot, but if you were to look at plaintiff's complaint, they're pursuing design and manufacturing claims here rather than failure to warn. So I do feel this is somewhat misdirected from what the actual claim is in the case. Let me ask you this. What are the odds that all 63 owners and operators of those heights inspect the screw every 30 days? Again, Your Honor, I don't have certainty on the odds for you, but this is something that Do you have some certainty that it's less than 100%? I could say that it would be maybe less than 100%, but I can say with certainty that we have no records of any prior incident being reported to us, whether via warranty claim, legal claim, otherwise of any instance where someone has failed to either use the correct part in the maintenance of one of these products or where the hoist has unraveled from the upper hook assembly, the screw has come loose. That is something I can say with certainty we have no risks of, and that is something that's undisputed in this case by the plaintiff appellate as well. Let me ask you this. If that screw comes unraveled or broken and it's not in place, what happens? I don't have an answer for that, Judge, because we haven't seen that occur. What happened in this case? Well, in this case, we had a screw that was not the appropriate part and was lacking the Loctite adhesive. My question is, if the screw isn't operating like it should, what happens? Sorry, could you repeat that? If the screw doesn't operate like it's intended to operate, what happens? Well, if the screw doesn't operate and you take out the idea of the Loctite and the depth, if it unravels, then presumably the hook could, but that is a secondary issue that would happen. The lock washer would also have to come loose. The redundancy plate would have to come loose, and then the screw, excuse me, the hook itself would also then have to unravel. These are situations we didn't have here because our screw was not in place, and plaintiff's own expert admits that had the Columbus McKinnon screw been in place at the time of the accident, and that's one that has this locking adhesive on its threads, this accident never occurs. If that screw needs replaced, the person replacing it needs to go to the operator's manual to recognize that a screw that fits that hole isn't sufficient. It needs to be a screw that fits the hole that has Loctite on it. Again, Judge, this is an industrial equipment where someone who is qualified is supposed to be. The answer, is that yes or no? They would need to know that they used the correct part, yes. Okay. All right. Thanks. Another issue that I would like to just correct on the record is with respect to the notion of interchangeability that's been discussed. Plaintiff's expert has not notably said in this case that the subject screw, what we've been calling the subject screw, the one that was in place on the date of the incident, is interchangeable with the Columbus McKinnon screw. Plaintiff's expert makes a generic statement that screws and bolts are usually interchangeable, but what he notably does not do is ever say that these two screws are interchangeable with one another, and it's our position in what we've submitted to the court that they are not because we're talking about two different lengths, one is nearly twice the length of the other, and again, that screw does not have Loctite, the subject screw that we've been talking about that was in place on the date of the incident. Well, does anyone say that it's the length that was the problem? Plaintiff's expert says both that the length of the screw is the problem and that the absence of Loctite. I thought he conceded that the length didn't make a difference, it was only the Loctite that made a difference. No, Judge, there is, if I'm in the correct location for that, in the opening brief we have Plaintiff conceding that use of too long a screw was essential to the cause of the loss. I don't have the specific citation for Plaintiff's expert, but in one of his declarations he also does identify that the use of a screw that was too long for the hoist was a cause of the incident here. He primarily says that the use of a screw that was lacking that locking adhesive on its threads was the essential cause of the loss, and says that if the screw had had that adhesive on it on the date of the incident, this incident never occurs, which is what we say entitles us and was why the Court correctly granted summary judgment in our favor, because that is a concession, that if the hoist was as designed, it was using the parts that the manufacturer was using, and that if the hoist was not designed, it was using the parts that the manufacturer was using, then this accident never occurs, and therefore Plaintiff cannot carry the prima facie burden of showing that this hoist was dangerously defective at the time it left the manufacturer's hands. And just as it was reasonably foreseeable that someone might not follow the instructions in the operator's manual about how to replace that screw. Well, Judge, on the topic of reasonable foreseeability, that is where the issue of known risks comes into play. Again, as we've been discussing today, we've had more than 63,000 of these hoists sold since 2004, and no prior instances where this has occurred. That goes directly to the issue of reasonable foreseeability, and we would submit that the evidence shows that this was not reasonably foreseeable, and therefore the Court was appropriately granting summary judgment on those issues. Well, there could be other machines out there that have the wrong screw. They just haven't fallen down yet. Judge, that's a hypothetical that I couldn't say one way or the other. What I'm saying is there could be people or entities using the wrong screws, and you just haven't found out about it. They may happen, and they may catch the mistake, and they fix it, or it just hasn't happened yet. Certainly. We don't know what we have not been informed of, but this is something that we continually do monitor. Our internal folks are keeping track of any claims that come into us. We are tracking this. We have been since at least 2004 when our records go back to, and no one has ever encountered this issue outside of this case where we know that the part was put in was not one that was approved by Columbus McKinnon. And, Judge, did you have a question? I just want to be clear. So when we're referring to the expert's opinion, the plaintiff's opinion, I think you're referring to ER 38. There's this mistake on the subject's screw, the failure to have a torque marker, the use of a screw that was too long. I think that's the language you're referring to? Yes, Judge. All right. That's a little loud. Did that answer both of your questions? Okay. It did. Just to continue on, then, with respect to the other design defect claims that have been alleged in this case, I think this is something that was correctly dismissed by the district court. You know, it's a bit of a red herring, these notions that there were additional things that could have been done with the design of this hoist, as we have the testimony here, excuse me, the evidence here from plaintiff's own expert that had the hoist been as designed on the date of the incident, we're not having this issue occur. That's, again, with the Loctite. So the notion that there were additional things that could have been done with the design defects or torque markers, we really think those are red herrings that don't go to the issue, and that that was correctly rejected by the district court. I do think we probably extensively addressed our views on the foreseeability, and I see my time is up. So absent any other questions, I will not steal counsel's time and pass it over. Well done. Thank you. She gave you five seconds extra. Counsel, your honors, thank you. So as you know from our briefing, sorry, Adam Murray for Cone Cranes, our briefing tracks Ms. Cunard's on the issues of product liability and the statutory defense. So I just want to address any questions you might have about the negligence claim against Cone Cranes. So Cunard alleged that Cone Cranes negligently serviced the hoist by doing a number of things, including one thing that took place before the sale and one thing that took place after the sale, failing to properly inspect the hoist. The claim itself is a little bit nonsensical since it alleges that Cone Cranes negligently serviced the hoist, but most of the things that he brought up took place beforehand. On the one claim that happened after the sale, Cunard did not dispute that Pierce did not ask for Cone Cranes to inspect the upper hoist assembly, the upper hook assembly. There are service records at SCR 46 and 50 that list the parts that were used. Cone Cranes listed all the parts that were used, all the service that was done. Everything performed appeared in the invoice. There's simply no evidence on who... So we basically have no evidence anywhere about who touched, who changed the screw, right? So we have Cone Cranes has these records of the billing that don't say anything about a screw. They have their inspection records that don't say anything about a screw or anyone touching it. And so why isn't it 50-50 which of Cone Cranes, like why isn't it, why should we assume that it must have been the user instead of Cone Cranes in that situation? Well, Judge Friedland, I don't think it is 50-50 because the evidence on our side is the way that Cone Cranes does service and tracks all the parts that are used and performed. On their side, there isn't evidence. So we came forward with enough evidence to show that we didn't touch the hook when you... So we have the billing records. Is there testimony that says we always write down everything we do? Yeah, there is. Yeah. Where is that? That would be in the declaration of Mike Petrito. That's in the district court record. It's docket 57. So that is Cone Cranes' approach to doing it. And if you look through those records that are in the supplemental excerpts, then you'll see that all the parts that were ordered for this repair are listed. And there's not a single screw or bolt there. It's also not entirely clear to me that Coon Rods is necessarily appealing this negligence to the public. There's only a couple of allegations in the opening brief that I just want to touch on briefly. One is that the cost of the service was almost 50% of the hoist price. And from that, Coon Rod thinks that you guys should be able to infer that this was a comprehensive servicing. But that's not really the case. The only thing that you can infer from the cost of the service is the cost of the service. And it's undisputed that the service did not involve the upper hook assembly at all. Cone Cranes' service involved the chain aspect of the hoist. So if you look at the diagram of the equipment on SCR-106, you can see that you can set this thing down on a table, lay it on its side, open it up and take out all the chain assembly equipment that we worked on and put it back together without even touching the hook. He also alleges that Cone Cranes was the last person to touch the upper housing, but that can't possibly be true. The crane was in service for about five months before it came to us for service. And we fixed it, sent it back on April 1st of 2015. The accident happened almost 16 months later. So I think particularly given the lack of evidence on their side, the amount of time that we spent with the condition of the hook when we got it after only five months, it would not be reasonable to infer that Cone Cranes was the only person who could possibly have touched the hook. I guess one question I have really for all the parties in this case is that why would someone remove the Loctite screw and replace it with a screw that was too long? If there's never been a failure of this before, it's always been great, how did this even happen? Why would someone do that? There's not really evidence in the record that goes to that question, but what I would suggest you look at is the condition of the equipment when it did come to us for service, that it had been in service for only five months and the chain mechanism was essentially destroyed. So there was obviously some very hard use going on of the equipment. We fixed it and sent it back and it was in good condition. If the thing operates, it vibrates heavily, is that what you're saying? That's not necessarily what I'm saying. When Coonrod used it, it probably vibrated heavily. What's the distinction? What are you saying? I think it's, well, again, this isn't in the record, but if the equipment came back to us just five months after going into service and the chain mechanism was that damaged, that all those parts had to be replaced, then I think one reasonable inference would be that there was some kind of pretty heavy use going on. Are you saying it was being used beyond its specifications or something? It's only supposed to be up to 10 tons and they're using it for 20 tons or I don't know what? No, I wouldn't be suggesting anything that specific. I'm just trying to come up with a reason why somebody might end up replacing the screw. So what you're saying is if there's heavy use, that screw is likely to be under greater stress and either break off or come loose, even with the Loctite on it? No, I would think 63,000 units without that ever happening is probably evidence that that's not likely. So I'm trying to understand what you're saying then. You're saying the heavy use is the reason you think that this screw needed replacement if there's nothing wrong with it? Well, Judge Reza, at this point I'm just speculating, just like the jury would just be speculating. The question was why would someone replace the screw? And the only reason I can think of is if there was some kind of heavy use or perhaps they were moving the hoist itself from one crane to another. I don't really know. It's just speculation. There's no evidence.  Thank you very much. Is there anything in the record that answers the question I asked as to why someone would do this? I mean, for example, I can't imagine someone would take this thing apart to cannibalize a Loctite screw. You know, like at my house, remote controls for TVs get cannibalized because they want batteries for a flashlight or vice versa. I can't see that being the case here. Yeah, right. And again, that goes specifically to our question regarding, or to our pleading, which is that there was a design flaw on the actual hoist using that only one screw. So at some point, and again, we believe that there's a reasonable inference that Concranes was the last party to touch the hoist mechanism. And therefore, because of that, we believe that there's a reasonable inference that that screw was replaced by Concranes. Even though it's not in their record or not in their evidence, but no one from the user of the hoist even inspected the item. And so the answer as to why someone would replace the screw is specifically a question of material fact that we believe that should have survived summary judgment. But I take it there was no expert testimony or anything in the record just to get down to the core of the question of why would Concranes be the answer to that question? And that's where I think a jury would be able to make the reasonable inference that Concranes was the one who replaced the screw and or the bolt and or that the design of having just one bolt on this hoist, which as you said, Your Honor, this is a hoist that is being used heavily. Mr. Concranes' attorney just admitted essentially that it was such heavy use that it needed service within five months of it being in use. And therefore, there was a design flaw because it caused a situation where the screw and the hoist mechanism itself was weak and required that service. Well, do you have any answer to the fact that CMCO claims that they had 63,000 sales and this never happened to any other unit? Well, did you explore that with them? And did you come up with any reason why they haven't had any complaints? Well, I think Your Honor brought up a really good point in that this there may be others out there that are just waiting. That's my point. My question is what's your point? Did you explore that with them to find out what's the reason? How is it possible that my client's the only person in 63,000 who's been injured because one screw holding up this hoist heavy equipment over his head failed? Why is he the only one? Did you explore that and see what the reason could be for their statistic? Did you drill down on that at all? You don't expect your expert to do the investigation for you. Did you investigate it? Well, I guess not as much as we probably should have, to be honest. But that is something that our expert in terms of design flaw indicated that that's where the design flaw came in. The expert said it wouldn't have happened if the screw had been replaced with a conforming screw. That's right. And that's where that failure to warn and the failure to specifically indicate what size screw and to use the Loctite when replacing the screw was so important. And if there are no other questions, I have no questions. Okay. Thank you. All right. Thank you to all counsel for your briefing and argument in this case. This matter is submitted. Coming from Buffalo to Portland is a long way. So appreciate you making the trip. This matter is submitted and this panel will return tomorrow.
judges: OWENS, FRIEDLAND, Rayes